JOE L. SCHMITT, JR., AND HELEN M. SCHMITT, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60267.   Filed May 20, 1958.

*Carl F. Bauersfeld, Esq.*, for the petitioners.
*Karl C. Crouter, Esq.*, for the respondent.

Respondent determined deficiencies in petitioners' income tax for the years 1949, 1950, and 1951 in the amounts of $31.44, $9,357.72, and $2,643.40, respectively.

The issues, reduced to two by the parties, are first, whether certain transactions resulted in the sale or exchange of a capital asset, and second whether certain payments made by petitioner qualify as deductions.

### FINDINGS OF FACT.

Some of the facts were stipulated and are so found.

Petitioners Joe L. Schmitt, Jr. (hereinafter sometimes referred to as petitioner), and Helen M. Schmitt are, and were during the years 1949, 1950, and 1951, husband and wife. They filed joint income tax returns for those years with the then collector of internal revenue at Phoenix, Arizona.

Petitioner has engaged in accounting work since 1925. He and his wife reside in Phoenix, Arizona, and over the years his accounting work has been done in and around that city. In the course of his work he developed a procedure which converted, through the use of tabulating cards and certain machines manufactured by Remington Rand Incorporated (hereinafter referred to as Remington Rand), single-entry bookkeeping records into double-entry records. Remington Rand did not manufacture these machines specifically to meet petitioner's needs. The machines were adapted to meet those needs by a wiring unit developed by petitioner, which was also manufactured by Remington Rand. He has not changed the procedure since 1947.

Petitioner named his procedure the Exact-O-Matic System. In April 1950 he applied to the United States Patent Office for the registration of two service marks and designs in connection with the Exact-O-Matic System. They were registered in December 1951.

Petitioner obtained copyrights to the following three pamphlets connected with his Exact-O-Matic System:

| Title | Year of copyright |
|---|---|
| Bookkeeping for Small Business | 1946 |
| Selling Exact-O-Matic System | 1948 |
| Exact-O-Matic System (Manual of Procedure) | 1949 |

Petitioner made three applications for patents. Two of his applications listed his invention as a "Mechanical Method of Double Entry Bookkeeping." The third application concerned the same procedure. These applications were made in 1948, 1949, and 1952.

Remington Rand publicized petitioner's procedure. The petitioner did not solicit sales of the Exact-O-Matic System.

During the years 1949, 1950, and 1951 petitioner entered into a total of 11 substantially similar agreements (hereinafter called territorial assignments), the relevant provisions of which follow:

### TERRITORIAL ASSIGNMENT OF PATENT

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*WITNESSETH:*

In consideration of the sum of Ten Dollars ($10.00), and other good and valuable consideration, paid to Assignor by Assignee, the parties have agreed as follows:—

(1) Assignor covenants that he is the owner of the entire right, title and interest in and to those certain United States Patents, Patents pending, Registrations and Copyrights hereinafter referred to as "Exact-O-Matic System," and that he has not mortgaged, pledged, hypothecated, or otherwise encumbered the same or any right, title, or interest therein in any manner whatsoever.

(2) Assignor hereby grants unto Assignee the exclusive right, privilege and franchise to use and sell the said Exact-O-Matic System, (District, Unit A and Unit B) throughout the Territorial area described as follows:—

All of the State of Oregon in addition to the counties of Cowlitz, Clark, Franklin, Walla Walla, Columbia, and Benton of the State of Washington,[1] and to use, employ, and operate any and all methods, procedures, and processes covered by said Patents, Patents pending, Registrations, and Copyrights, within and throughout the Territorial Area, and also any reissues or extensions thereof during the entire term of said Patents, Registrations, and Copyrights, subject, however, to the conditions and covenants hereinafter set forth. For the purposes of this agreement, the designation "Patent" is hereby defined to mean Patents, Patents pending, Registrations, Copyrights, and any oral or written agreement between the said "Assignor" and Remington Rand, Inc., a Delaware Corporation, heretofore or hereinafter issued to Assignor, relating to double entry machine bookkeeping methods, procedures, and processes.

(3) Assignee agrees to use their best efforts to establish and or sell District, Unit A and Unit B franchises, throughout the Territorial area, and to that end agrees to divide the Territorial area into Districts, and to grant licenses to operate said Exact-O-Matic System in said District, upon the conditions hereinafter set forth.

Assignee agrees to create and establish District No. 1 Franchise, either in their own name or by the assignment of the District to a corporation controlled by them within thirty (30) days from the date of this agreement, such District to embrace the State of Oregon, Counties of Multnomah, Washington, Clackamas, Clatsop, Marion, Polk, Columbia, Yamhill, Tillamook and Lincoln, and the State of Washington, Counties of Clark and Cowlitz.

It is further understood and agreed that Assignee shall produce a minimum of sales of District Licenses, according to the following schedule:—

On or before one year from the date of this Territorial Assignment, Assignee shall establish or sell a second District License, and every six months thereafter one additional District License, until a total of three District Licenses have been sold. The attached form of District License marked "Schedule A" shall be used in establishing said District Franchises.

---

[1] The assignments usually covered an area consisting of a single State.

Any sale of a District License, Unit "A" or Unit "B" License, to use said System shall be subject to approval of the Assignor, insofar as the competency and financial ability and integrity of the franchise applicant is concerned. All District License, Unit "A" and Unit "B" Licenses, shall be granted by the Assignee, subject to the conditions of that form of license marked "Schedule A, B, or C".

(4) Assignee agrees that in granting Licenses for District, Unit "A" or Unit "B" Licenses, they will use the same form of contract hereto attached (Schedule A, B, C) unless the parties hereto shall mutually agree upon a different form of contract.

The conditions of paragraph three (3) and four (4), as above stated, are for the protection of all other Territorial Assignees and to further insure an adequate sale price to the Assignor.

(5) Assignee shall have the right to fix prices for the sale of all Licenses within their territory, but agrees not to sell any District License for less than three thousand dollars ($3,000.00), excepting however the assignment of District No. 1 to a controlled corporation; or sell any Unit "A" or Unit "B" Licenses for less than one thousand dollars ($1,000.00) without approval of Assignor. Assignee shall also have the right to fix the price of Exact-O-Matic service to be made by District licensees, Unit "A" and Unit "B" Licenses, to Licensees customers for such services rendered.

(6) Assignee shall collect the sale price of each franchise granted within the territory and shall collect all royalties for the use of said Exact-O-Matic System, issued and granted by it pursuant to this agreement, and that when received it will pay to Assignor and/or his executors, administrators, and assigns, as his share of the business transacted within the territory herein described, the following:—

(a) Sixty percent (60%) of the sales price of each District License, Unit "A" or Unit "B" License for said System and service, within the territory described herein; and in addition thereto:—

(b) Fifty percent (50%) of the gross royalties collected from such territory by Assignee, which royalties shall not be less than ten percent (10%) of the gross fees charged by licensees for service under said license. Assignee to retain fifty percent (50%) thereof as its share.

Assignee agrees to pay to assignor his share of sales of District, Unit "A" and Unit "B" Licenses and royalties by the fifteenth of each month for the preceding month's sales and royalties, and to accompany such payment with a detailed report of such receipts, including a duplicate of orders written for new business by the licensees within the said territory, and agrees that Assignor shall have access to the books and records of Assignee at all reasonable times for audit and examination.

(7) Assignee agrees to supervise all District, Unit "A" and Unit "B" Franchises and licenses in their territory and to use their best efforts and ability to promote and preserve the said business of each District, Unit "A" and Unit "B" licenses. Assignee further agrees to maintain a uniform type of service in conformity with the standard practice and in the manner prescribed by the methods, procedures, and process of Exact-O-Matic System, in all licensed operations within the territorial area.

    \*        \*        \*        \*        \*        \*        \*

(9) Assignor agrees to arrange, without any further charge, a course of instruction and to fully train and instruct at his office in Phoenix, Arizona, all personnel of Assignee required to operate the equipment, methods, and procedures as employed and used by and under Exact-O-Matic System, in said District Number One License, provided, however, that all expenses of such

personnel, including transportation to and from Phoenix, Arizona, and their living expenses during the course of training, shall be without cost to Assignor.

Assignee agrees to arrange and give a course of training and instructions to the accountant and tabulating operator in Exact-O-Matic System as outlined. Said course shall be given to the personnel of each District Franchise for a period of not less than thirty days, beginning with the personnel of the Second District Franchise.

Assignee further agrees to arrange and give a course of training and instructions to the accountant and tabulating operator in Exact-O-Matic System as outlined for the personnel of Unit "A" and Unit "B" Franchises, and shall arrange with said Franchise Holders compensation for such service rendered in training said personnel and for such other service as may be necessary in the installation of said Unit "A" and Unit "B" Franchises.

(10) Assignor agrees to use his best efforts with manufacturers of necessary equipment to procure same for use by assignee and its licensees, and agrees to procure such equipment designed and equipped with all devices necessary to process the work required under Exact-O-Matic procedure within three months of date order is accepted by Remington Rand therefor, by such Assignee or its licensees.

\* \* \* \* \* \* \*

(12) Assignor agrees to defend at his own expense any litigation arising within or without the territorial area challenging his right to use any of the aforesaid patents to the end that all rights secured to Assignee herein may be preserved.

(13) Assignee shall select its own personnel and employees and have complete dominion and control over them, and Assignor shall have no dominion or control over any of said employees except such as may be necessary in the course of training provided for in paragraph numbered "9" of this agreement, it being the intent and purpose of this paragraph to evidence the fact that Assignee is the territorial owner of the patent, operating completely independent of Assignor. Assignee agrees to pay all taxes levied or assessed against them, including industrial or security taxes for their employees, and to file all necessary reports and returns therefor.

Whenever any license shall be granted under this Assignment, the licensee thereunder shall be the territorial owner of the patent, having complete dominion and control over his or its employees and shall accept full responsibility for all taxes levied or assessed by reason of the operation of such license and shall file all necessary returns required therefor.

\* \* \* \* \* \* \*

(15) Assignee agrees not to assign or dispose of this Territorial Assignment in whole or in part without the written consent of Assignor.

The arrangement between petitioner and the holder of a territorial franchise (referred to as the "assignee" in the foregoing agreement) contemplated that the franchise holder, in turn, would establish a certain number of districts within his franchise area and would grant licenses covering each district. However, "District No. 1" within each franchise area was to be operated by the franchise holder himself or by a corporation controlled by such franchise holder. "Unit A" franchises were to be granted to single companies for their own book-

keeping purposes. "Unit B" franchises were to be granted to an accountant for a fixed number of customers. No Unit A or B franchise was ever issued.

Prior to November 15, 1949, petitioner, his wife, and a person named Weaver each owned 1 share of the stock of the Exact-O-Matic Corporation (hereinafter referred to as the corporation). This corporation was incorporated in Arizona, and up until November 15, 1949, had only 3 shares of stock outstanding. On that day 37 additional shares were issued to new stockholders none of whom was a member of petitioner's family.

In December 1949 petitioner entered into an agreement with the corporation, the relevant provisions of which follow:

*WITNESSETH*

(1) Party of the First Part is the sole owner of the entire right, title and interest in and to those certain United States Patents, Patents pending, Registrations and Copyrights referred to under that certain trade name "Exact-O-Matic System", and that he has not mortgaged, pledged, hypothecated, or otherwise encumbered the same, or any right, title, or interest therein in any manner whatsoever.

(2) Party of the First Part hereby grants unto the Party of the Second Part, subject however to the conditions and covenants hereinafter set forth in this agreement, and subject further to the provisions and limitations contained in the Territorial, District, Unit "A", Unit "B" and Unit "I" franchises issued or to be issued, the exclusive right, privilege and franchise to use the registered trade name Exact-O-Matic System as it's corporate name, to promote the sale of Territorial franchises within and without the limits of the United States or it's possessions, and to supervise the operation of said Territorial franchises already established or to be established.

(3) Party of the Second Part agrees to use its best efforts to promote and sell Territorial franchises throughout the United States and its possessions, it being understood and agreed that Party of the Second Part shall produce a minimum of sales of Territorial franchises of not less than five in any one calendar year or until all 48 States of the United States of America are sold, providing however tabulating equipment is available. In the event said tabulating equipment is not available due to conditions beyond the control of the Party of the Second Part, then Party of the First Part shall waive this specific provision of this Agreement until such time as said equipment shall be available.

(4) Party of the Second Part agrees to use its best efforts in the supervision of those Territorial franchises already established and those Territorial franchises to be established and further agrees to enforce and carry to completion the covenants and provisions contained in said Territorial franchises.

(5) Party of the Second Part agrees to arrange, without any charge, a course of instruction and to fully train and instruct the personnel of each Territorial franchise required to operate the tabulating equipment to be used in the Exact-O-Matic process in accordance with the provisions of the Territorial franchise.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(7) Party of the First Part agrees to pay to Party of the Second Part from the proceeds received from the sale of Territorial, District, Unit "A", Unit "B", and Unit "I" franchises an amount equal to:

> 25% of the Net Sale Price of each Territorial Franchise.
> 15% of the Net Sale Price of each District Franchise.
> 15% of the Net Sale Price of each Unit "A" Franchise.
> 15% of the Net Sale Price of each Unit "B" Franchise.
> 15% of the Net Sale Price of each Unit "I" Franchise.

In addition to the amounts computed upon the basis of the above schedule, Party of the First Part agrees to pay to Party of the Second Part 25% of the royalties when received by Party of the First Part from the Territorial Franchise Holders, said royalty being ten percent (10%) of the gross fees for all service rendered by the Exact-O-Matic System process in all of the classifications of franchises granted.

In accordance with the provisions of the Territorial Franchise granted by Party of the First Part (Section 6-b) gross royalties are divided as follows:

> Party of the First Part_____ 25%
> Territorial Franchise Holder_____ 50%
> Party of the Second Part_____ 25%

(8) Party of the Second Part agrees not to assign or dispose of, mortgage, pledge, hypothecate or otherwise encumber this agreement or future proceeds therefrom in whole or in part without the written consent of the Party of the First Part.

Petitioner, both before and after November 15, 1949, was an officer of the corporation. Petitioner received neither salary nor royalties from the corporation. Petitioner, who was occupied with his own clients, did not aid the corporation in furnishing Exact-O-Matic service to its clients.

Petitioner received a letter from Remington Rand dated May 3, 1951, stating:

> We have had considerable correspondence regarding the design of the wiring unit known as the General Accounting Wiring Unit #NB4-14055, which is used specifically by Exactomatic franchise holders as a set-up to enable them to use the Remington Rand Model 3 Tabulator to produce results known as— "Double-Entry Bookeeping".
>
> This is to advise that we agree not to knowingly manufacture, lease, or sell a tabulating wiring unit arranged with the exact specifications as Wiring Unit #NB4-14055, or assign such number to any future wiring units, except for the franchise holders of Exactomatic Systems of Joe L. Schmitt, Jr.

Remington Rand charged petitioner $260 for each wiring unit manufactured for the Exact-O-Matic System. This was so whether the machine containing the wiring unit was rented or sold by Remington Rand. In the event it was rented the wiring unit would be returned to Remington Rand with the machine at the termination of the lease; such wiring unit belonged to petitioner, and if the machine, together with the unit, were subsequently rented, no further charge was made by Remington Rand to petitioner for the unit.

Petitioner has never applied for a copyright, trade-mark, or patent other than in connection with the Exact-O-Matic System.

Notwithstanding the first above-quoted paragraph of the territorial assignment (concerning the $10 consideration) petitioner received the following net amounts [2] in connection with the 11 territorial assignments entered into during the years in question:

| | |
|---|---|
| 1949 | $7, 962. 02 |
| 1950 | 36, 992. 00 |
| 1951 | 10, 997. 00 |

Additionally, in accordance with section 6 (a) of the territorial assignments, petitioner received the following net amounts:

| | |
|---|---|
| 1949 | 0 |
| 1950 | $7, 498. 00 |
| 1951 | 1, 799. 00 |

Petitioner treated the net amounts received in accordance with section 6 (a) and the net amounts received in place of the above-mentioned $10 as gains from the sale or exchange of a capital asset. Respondent determined that these payments were ordinary income.

Amounts received by petitioner in accordance with section 6 (b) of the territorial assignments were treated by him as ordinary income.

During the year 1949 petitioner personally carried out the obligations imposed on him by paragraph (9) of the territorial assignment.

During 1950 and 1951 "personnel" sent to Phoenix by territorial assignees to study the Exact-O-Matic System were trained by the corporation to operate the necessary machines and were given instruction in the use of the system.

Petitioner made payments to the corporation totaling $10,375 in 1950 and $3,020 in 1951. These amounts were calculated in accordance with their agreement. The corporation reported these payments on its income tax returns as ordinary income. Petitioner, in the course of computing his "long term gain" resulting from the territorial assignments treated these amounts as "expense(s) of sale" and reduced the amounts he received as a result of the territorial assignments accordingly. Respondent refused to allow any reduction in respect of the amounts thus paid to the corporation.

The management of the corporation felt that it had expended more money in 1950 on its training program than it had received under section (7) of its agreement with petitioner, and that it had rendered some training services on petitioner's behalf that were beyond those required of it by the agreement. Petitioner, in that year, issued personal checks, payable to Remington Rand, in the total amount of

---

[2] "Net amounts" as here used mean total amounts received less certain uncontested offsets made in connection therewith.

$2,268.20. These checks were in payment of amounts owed Remington Rand by the corporation in connection with machine rentals and the purchase of office supplies, and were issued by petitioner in recognition of a possible claim against him by the corporation. Petitioner treated the total amount of these checks as an expense incurred in his business and deducted it accordingly. Respondent disallowed the deduction.

OPINION.

RAUM, *Judge:* 1. Petitioner Joe L. Schmitt, Jr., had developed a process, utilizing tabulating cards, to convert ordinary single-entry bookkeeping data into double-entry bookkeeping records. He named the process the Exact-O-Matic System. The system was operated by use of standard Remington Rand mechanical equipment, as modified by a wiring unit designed by petitioner which was also manufactured by Remington Rand but which it had agreed not to sell or lease to anyone other than a franchise holder of the system. The system was intended for use by accountants in providing service for small businesses. Petitioner has applied for several patents and has obtained certain trade or service marks in connection with the system; also he has obtained copyrights of several pamphlets relating to the system.

During the years 1949–1951, he entered into 11 agreements, in each of which he granted to the other contracting party, referred to as the assignee or territorial franchise holder, a franchise with respect to the system throughout a specified area. In general, each such area covered a State, and it was petitioner's purpose to continue to issue similar franchises throughout the United States. The plan contemplated further that each territory would be divided into districts, and that the territorial franchise holder would, in turn, issue licenses for use of the system, presumably by accountants, for each such district.[3] Moreover, petitioner required each franchise holder, either alone or through a controlled corporation, to operate the system in one of those districts, referred to as "District No. 1."

In connection with the creation of each territorial franchise petitioner received a lump sum. Also, upon the issuance of licenses by the territorial franchise holder, a lump sum (referred to as the "sales price") was payable by the licensee to the territorial holder, and, pursuant to section 6 (a) of the territorial franchise, 60 per cent of that lump sum was payable to petitioner. In addition, each licensee was required to pay royalties (which were to be not less than 10 per cent of the gross fees charged by the licensee for service under the

---

[3] In addition to "District" licenses, the agreements also provided for the issuance of certain other licenses referred to as "Unit A" and "Unit B," but no such other licenses were ever issued.

license) to the franchise holder, and, pursuant to section 6 (b) of the territorial franchise, the franchise holder, in turn, was required to pay 50 per cent of such royalties to petitioner.

We are called upon to decide whether the lump sums paid to petitioner directly in connection with the issuance of the territorial franchises and that portion of the lump sums collected from the licensees and paid over to him pursuant to section 6 (a) of the territorial franchise agreements are to be treated as the proceeds from a "sale or exchange of a capital asset" under section 117 (a) (4), I. R. C. 1939. Cf. also sec. 117 (q) of the Code, added by the Act of June 29, 1956, ch. 464, 70 Stat. 404. Petitioners reported such amounts as long-term capital gains on their returns, and the correctness of the Commissioner's determination that they represented ordinary income is the principal issue before us. Petitioners reported their portion of the royalties received under section 6 (b) of the territorial franchise agreements as ordinary income, and no question is here presented as to such royalties.

Petitioner contends that each of the agreements with the 11 territorial franchise holders resulted in a "sale or exchange" of all his substantial rights in the Exact-O-Matic System to the territorial franchise holder, and that therefore the consideration received by him must be treated as the proceeds of a sale under section 117, entitled to the preferred treatment accorded to capital gains under the Code. At the outset, it may be observed that his position is not consistent as to all of the consideration received, for, as noted above, the so-called section 6 (b) royalties were reported as ordinary income and they are not in controversy herein. If the transactions were in fact sales then all the consideration received, whether denominated as "sales price" or as "royalties," would be regarded as proceeds of the sales. See *Rose Marie Reid*, 26 T. C. 622, 632.

Whether petitioner in fact transferred all of his substantial rights in the Exact-O-Matic System within the area of each territorial franchise depends upon an appraisal of all of the evidence, particularly of the arrangements between petitioner and the territorial franchise holders. Referring to a transfer of patent rights in *Rose Marie Reid*, *supra*, we said (p. 632):

> Nor is the question governed by the use of particular words of art. The transaction suffices as a sale or exchange if it appears from the agreement and surrounding circumstances that the parties intended that the patentee surrender all of his rights in and to the invention throughout the United States or some part thereof, and that, irrespective of imperfections in draftsmanship or the peculiar words used, such surrender did occur. * * *

Cf. *Watkins* v. *United States*, 252 F. 2d 722 (C. A. 2, 1958). It is our conclusion, after a careful study of the entire record in the present

case, that petitioner retained, in the aggregate, such continuing rights and interest in the system as to preclude recognizing these transactions as sales.

An examination of the territorial assignment or franchise and the form of license or district franchise which the territorial holder was required to use in granting a district license amply discloses the broad range of rights, powers, and interests reserved by petitioner as well as the substantial limitations imposed upon the rights assigned to the territorial franchise holder, or assignee.

(a) The assignee agreed not to assign or dispose of his territorial franchise in whole or in part without petitioner's written consent. The veto power thus retained by petitioner upon disposition of the territorial franchise by the alleged purchaser from petitioner is completely without restriction. Petitioner retained the unlimited power to forbid or permit any sale or assignment of the territorial franchise holder's rights. Such sweeping control over one of the most important aspects of property ownership—the right to sell or dispose—is hardly consonant with the position that petitioner had sold all of his substantial rights in the system within the area of the territorial franchise.

(b) Petitioner's continuing interest is further shown by the territorial franchise holder's contractual undertaking to divide the franchise area into districts and to grant licenses upon conditions agreed to between the territorial franchise holder and petitioner.

(c) The territorial franchise holder was required to agree to establish "District No. 1," defined to embrace specified portions of the franchise area, in his own name or by assignment of the district to a controlled corporation within 30 days.

(d) The territorial franchise holder contracted to produce a minimum of sales of district licenses, according to a specified schedule.

(e) Any sale of a license by the territorial franchise holder was required to have petitioner's approval as to the competency, financial ability, and integrity of the applicant for the license, and the licenses themselves were to be subject to conditions contained in a specified form of license. The record before us does not contain that form, but there is in the record the actual license that was issued in the case of one district. Since the burden of proof is upon the petitioners, we must assume that the conditions in the form were no less onerous than those contained in the license itself, or that the parties had not meanwhile agreed upon a different form. Among such conditions were the following:

(i) Comprehensive provisions for the payment of royalties based upon a percentage of gross fees charged by the licensee, as well as provision for rendering monthly reports.

(ii) Provisions for making available licensee's books and records to the territorial franchise holder *and* petitioner.

(iii) Provisions granting territorial franchise holder the right to inspect and supervise the licensee's operation of the system to determine that service is being rendered in accordance with the standard practice and prescribed method.

(iv) Licensee's undertaking not to assign or transfer the license without the written consent of the territorial franchise holder "and approval of Patent owner."

(v) Upon death of licensee, his interest must pass to his estate, "and upon proper showing" to the territorial franchise holder *and* petitioner, the license may be disposed of "to competent parties who are qualified to conduct the business of said district licensee subject to approval by Franchise Holder and Patent Owner."

(f) The territorial franchise holder could not sell licenses for less than specified minimum prices.

(g) In the issuance of licenses, the territorial franchise holder was forbidden to provide for royalties that would be less than 10 per cent of the fees charged by the licensee.

(h) The territorial franchise holder agreed to furnish petitioner with detailed monthly reports of sales and royalties, "including a duplicate of orders written for new business by the licensees."

(i) Books and records of territorial franchise holder were to be open to petitioner for audit and examination at all reasonable times.

(j) The territorial franchise holder was required to agree to supervise licenses, and to use best efforts to promote and preserve the business of each district and license; also, to maintain a uniform type of service in prescribed manner in all licensed operations within the territorial area.

(k) Petitioner reserved the right to terminate the franchise upon the holder's failure to make required payments of petitioner's share of sales and royalties.

(l) Petitioner obligated himself to furnish a course of instruction and training to "all personnel" of the territorial franchise holder "required to operate the equipment, method and procedures" of the Exact-O-Matic System; and, at the same time, he required the territorial franchise holder to give similar courses of instruction and training to licensees.

(m) Petitioner obligated himself to use his best efforts with manufacturers to obtain necessary equipment for use by the territorial franchise holders and licensees, and undertook to procure such equipment within 3 months of the acceptance of the order by Remington Rand.

(n) Petitioner agreed to furnish all sample forms "*now or hereafter* in use under Exact-O-Matic procedure." (Italics supplied.)

(o) Petitioner agreed to defend at his own expense any litigation challenging his "right to use any of the aforesaid patents."

We are of the opinion that the foregoing aspects of petitioner's relationship to the territorial franchise holder and the franchise itself are inconsistent with the position that he had disposed of all his substantial rights in the Exact-O-Matic System within each territorial area. It is important to note that we do not rest our conclusion upon any one of petitioner's retained interests or powers, and, without doubt, there are cases in which the reservation of some similar powers and rights has been held not to be fatal. We hold that *all* of the rights, powers, and continuing interests reserved by petitioner, *taken in combination*, are of such character as to be inconsistent with a "sale or exchange" of property by petitioner, and that Congress did not intend to confer the special benefits relating to sales of capital assets in such situations. It is no answer to say that a number of the rights reserved by petitioner were merely to protect his interest in the system or to insure full payment for the assignments. That reason may explain why such reservations were made, but it does not detract from the conclusion that petitioner did not in fact dispose of all his substantial interest in the system by reason of such reserved rights when taken together with all other reserved rights, powers, and interests.

Section 117 (q) of the Code, added by the Act of June 29, 1956, ch. 464, 70 Stat. 404, referred to by petitioners, does not strengthen their position. Not only is it limited to transfers of patent rights, but it deals with transfers "of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights." Our conclusion that the transfers herein (which involved far more than patent rights) were not made with respect to "all substantial rights" in the Exact-O-Matic System renders these new provisions inapplicable.

2. In their returns for 1950 and 1951 petitioners reduced the amounts received under the territorial franchises by $11,375 and $3,020, respectively, as "expenses of sale." The Commissioner refused to allow $10,375 of the reduction for 1950 and the entire $3,020 reduction for 1951. These represent the net amounts paid by petitioner to the corporation, in accordance with their contract, for giving instruction and training to "personnel" of the territorial franchise holders. Petitioner was obligated to furnish such instruction and training, and we think it plain that his payments to the corporation for carrying out that obligation on his behalf were a proper charge against the amounts received from the franchise holders. We hold that they are deductible.

In addition, a question had arisen between petitioner and the corporation with respect to some training of accountants by the corporation that may have gone beyond the strict requirements of the contract

between petitioner and the corporation. The corporation claimed that it was losing money on the entire arrangement, and the matter was settled by petitioner's payment of certain bills which the corporation owed to Remington Rand. These payments were made in 1950 and were in the aggregate amount of $2,268.20. We hold that this amount is similarly a proper charge against petitioner's receipts and is likewise deductible.

3. A final issue relating to the deductibility of certain expenditures with respect to rental properties has been conceded by the Government on brief.

*Decision will be entered under Rule 50.*