Arthur L. Touchett v. Commissioner. Arthur L. Touchett and Eleanor Touchett, his wife v. Commissioner.
Touchett v. Commissioner
Docket Nos. 68389, 68390.
United States Tax Court
T.C. Memo 1960-76; 1960 Tax Ct. Memo LEXIS 214; 19 T.C.M. (CCH) 403; T.C.M. (RIA) 60076; April 14, 1960
R. W. Ashton, Esq., for the petitioners. James T. Wilkes, Jr., Esq., for the respondent. WITHEY
Memorandum Opinion WITHEY, Judge: The following deficiencies in income tax of petitioners and additions to tax have been determined by the respondent: Additions to Tax Under Sections
Docket No.
Year
Deficiency
291(a)
293(a)
294(d)(1)(A)
294(d)(2)
Arthur L.
Touchett: 6833
1949
$ 288.48
$ 14.42
$ 17.31
1950
2,774.47
$693.62
138.72
$249.70
166.47
Arthur L. Touchett and Eleanor
Touchett: 68390
1951
2,716.64
543.33
135.83
163.00
1952
1,803.20
90.16
90.16
108.19
1953
543.22
27.16
32.59
After concessions by the parties on stipulation and on brief the only remaining issue for decision is whether amounts received by petitioner *215 Arthur L. Touchett as royalties in the taxable years 1949 and 1950 are to be treated as long-term or short-term capital gains. All of the facts have been stipulated by the parties which stipulation is adopted as our findings of facts. Petitioner Arthur L. Touchett resides in the Town of Empire, Wisconsin, and filed his Federal income tax returns for the years 1949 and 1950 with the collector of internal revenue at Milwaukee, Wisconsin. Petitioner was the originator and developer of the idea and invention which resulted in patents on a paint roller and tray. He had constructed a working model of these inventions more than 6 months prior to April 1, 1945. On that date, E-Z Paintr, Inc., hereinafter referred to as E-Z, a Wisconsin corporation, was organized with petitioner holding 50 per cent of its stock, which was issued to him in consideration of his contribution to the corporation of his development work on paint rollers and trays. On April 4, 1945, patent application No. 586576 was filed in petitioner's name covering the paint roller and on September 16, 1947, Patent No. 2427581 was issued to him in pursuance of said application and thereafter assigned by him to E-Z. On October 12, 1945, petitioner *216 filed an application for patent covering a paint tray and on July 6, 1948, Patent No. 244584 was issued to E-Z Paintr Corporation (also hereinafter referred to as E-Z), successor to E-Z, as assignee of petitioner. The assignment of the application had been made by petitioner on July 1, 1947. A third patent was also issued on June 29, 1948, to E-Z but was commercially worthless and is immaterial to the issues in this case. In July 1947, certain "Chicago interests" made loans to E-Z and obtained controlling interest in its stock. As a condition of the loan petitioner was required to assign such patents and patent applications as were held by him to E-Z. The "Chicago interests" had effective control of E-Z from July 1947 at least to and including the 5th day of January 1949. On October 23, 1948, petitioner and E-Z entered into an agreement that petitioner and his wife would transfer all of their stock interest in E-Z to that corporation in consideration of the assignment by E-Z to petitioner of all of E-Z's "claim against the E Z Paintr Company of Canada" and the transfer to petitioner of its inventory and machinery at an agreed value "which shall be the difference between $5,000.00 *217 and the book value of the claims" against the E-Z Paintr Company of Canada, all such values to be in accordance with book value at the time of the transfer of such assets; that E-Z. representing itself as the owner of the above-mentioned patents, would at a later date assign to petitioner title to such patents and that petitioner, simultaneous with such assignment, would enter into an exclusive license and royalty agreement with E-Z in a form to be thereafter mutually agreed upon; that such license agreement when executed was to contain among other things: "(a) A provision for the payment to Touchett by the corporation, as a monthly royalty, of a sum equal to 2% of the corporation's gross sales of patented paint rollers and paint trays, or $250 a month, whichever sum shall be the greater. "(b) A provision precluding Touchett from manufacturing or selling or causing the manufacture or sale, of any of the items covered by the patents above referred to, or of any paint rollers or paint trays substantially similar to the items covered by said patents, provided only that Touchett shall be entitled to manufacture such items upon the request and order of the corporation. "(c) A provision *218 conferring upon the corporation authority to sublicense other persons, firms, corporations, or association for the manufacture or sale of any of the items covered by the aforesaid patents." The agreement further provided that petitioner would not for a period of 7 years sell or cause the manufacture or sale of paint trays or rollers in competition with E-Z within a specific territory; that at the time of the execution of such license agreement petitioner would resign from E-Z as its president and director; and that at that time the corporation would make all necessary and appropriate assignments to petitioner in consideration of his delivery to E-Z of the stock certificates referred to, his entering into the license agreement referred to, and his execution of written resignations as such president and director of E-Z. On January 5, 1949, petitioner and E-Z executed the referred to royalty agreement wherein it was mutually agreed that petitioner was the owner of the mentioned patents, that petitioner grants to E-Z exclusive license to manufacture, market and sell the products covered by said patents for their full term or continuation or extension thereof in consideration of the *219 monthly royalty equal to 2 per cent of the corporation's gross sales of paint rollers and trays manufactured under said patents or $250 a month whichever was the greater, that petitioner would not manufacture or sell any items produced under such patents except that he was authorized to manufacture such items in the United States for sale in Canada alone, and that E-Z was granted the authority to sublicense other persons, firms or corporations for the manufacture and sale of any items covered by such patents. It is stipulated by the parties that petitioner "is entitled to capital gain treatment on net royalies received in the years 1951, 1952 and 1953." Under the royalty agreement, executed January 5, 1949, petitioner received as royalties the respective amounts of $6,605.06 and $19,260 during the taxable years 1949 and 1950. On June 29, 1956, section 117 of the Internal Revenue Code of 1939 was amended by adding a new subsection, (q), which provides that a transfer of substantial rights to a patent is to be considered the sale or exchange of a capital asset held for more than 6 months. By section 117(q)(4) the amendment was made applicable only to amounts received by virtue of *220 the transfer of such rights to a patent beginning with any taxable year after May 31, 1950, without regard to the taxable year in which such transfer was made. Petitioner's contention is that no holding period is required with respect to patent rights conveyed in a royalty agreement by virtue of section 117 of the Code, as amended, and by virtue of rulings of the Commissioner with respect thereto. We are unable to come to the conclusion urged by petitioner. It is clear to us that the statutory amendment, section 117(q), has effect only with respect to royalty payments received in a tax year beginning after May 31, 1950, and has no application whatsoever to petitioner's receipt of royalties during the taxable years 1949 and 1950. For periods prior to that date it has been specifically held that the statutory holding period of 6 months was required in order that the sale or exchange of a capital asset received long-term, as distinguished from short-term, capital gains treatment. Franklin S. Speicher, 28 T.C. 938; Paul L. Kuzmick, 11 T.C. 288; Edward C. Myers, 6 T.C. 258. On this issue, we find for the respondent. Petitioner also contends that *221 should we decide that a 6-months' holding period is required in order that his receipt of royalties during 1949 and 1950 receive long-term capital gains treatment, he is to be regarded as having held the rights to his inventions, represented by the patents referred to, for more than 6 months prior to January 5, 1949, the date of his execution of the royalty agreement. Respondent makes no contention, as suggested by petitioner, that petitioner's rights in the capital asset, which his inventions constitute, did not come into existence at the time prior to the issuance of patents thereon when he had conceived his idea for a paint roller and tray and demonstrated the same by a working model. Respondent's contention is that, even though the capital asset so constituted existed at that time, it was conveyed by petitioner to E-Z prior to his holding thereof for a period of 6 months and that his holding thereof prior thereto may not be tacked on to his later holding thereof upon reassignment to him of such patent rights by E-Z beginning in July 1947. In that regard petitioner contends that his assignment of patents and patent rights to E-Z constituted only a transfer of the bare title thereto *222 for the purposes of obtaining loans from the "Chicago interests" and that equitable title remained in petitioner during that period, the duration of which prior to the execution of the royalty agreement exceeded 6 months. We find nothing in petitioner's "Memorandum of Agreement" of October 23, 1948, with E-Z which would indicate that the patents and patent rights held by E-Z prior thereto were intended merely as a loan to E-Z in order that it might be made to appear to the "Chicago interests," who were prospective lenders, that E-Z was sufficiently capitalized to justify and secure their loan. The "Chicago interests" were not so deceived. They made the transfer of the patents and patent rights a condition of their loan. They at least intended that the transfer would afford actual security for the loan. In the October 23, 1948, agreement, it appears that petitioner repurchased the patents and patent rights here involved from E-Z in consideration of his agreeing to enter into an exclusive licensing agreement with that corporation and his agreement not to compete with E-Z or its assignees in the manufacture and sale (except in Canada) of articles under such patents and in consideration *223 of the transfer of his and his wife's stock to E-Z. If it were a fact that petitioner's assignments of his patents and patent rights to E-Z constituted mere loans of those rights to E-Z for the purpose of obtaining capital from the "Chicago interests," it would have been exceedingly simple for petitioner and E-Z to have specifically so agreed, yet no evidence has been forthcoming that such was the case. It is true that we might by pure conjecture conclude that this was the reason for the original transfer by petitioner of his patent rights but, faced with the unequivocal unambiguous written agreement of the parties to that transfer, we do not feel justified in resorting to such conjecture. It is our conclusion that petitioner's assignment of his patents and patent rights to E-Z in 1947 was a completed transfer of those rights and all of them and that such rights not having been reconveyed to him until January 5, 1949, the "date of closing" referred to in the Memorandum of Agreement executed October 23, 1948, petitioner's transfer of such rights by his royalty agreement of January 5, 1949, does not provide the 6-months' holding period required by section 117 of the 1939 Code in order *224 to afford him long-term treatment of his capital gains. It therefore follows that the amounts received by petitioner as royalties under his royalty agreement during the taxable years 1949 and 1950 are to be treated as short-term capital gains. Decisions will be entered under Rule 50.