FRANKLIN S. SPEICHER AND ELEANOR SPEICHER, HUSBAND AND WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 59449. Filed July 31, 1957.

*C. Walter Smith, Esq.*, for the petitioners.
*Gerald Backer, Esq.*, for the respondent.

OPINION.

BLACK, *Judge:* There are two issues involved in this proceeding. They are: (1) Were the percentage payments received by petitioner from M. E. Cunningham Company for the calendar years 1951, 1952, and 1953 capital gains from the sale of an invention of a steel stamping machine which he had perfected but not patented prior to its assignment to the company, or royalties, taxable as ordinary income; and (2) are the petitioners subject to additions to tax for failure to file a declaration of estimated tax for 1951 and for underestimation of their tax for 1951? No additions to tax have been determined for 1952 and 1953.

We shall take up these issues in their order.

*Issue 1.*

There is no controversy as to the amounts which petitioner received in 1951, 1952, and 1953 as percentage payments from the company under the agreement which has been set out in our Findings of Fact.

Petitioners returned these amounts as long-term capital gain and paid tax thereon as provided in section 117. The joint returns of petitioners for each of the 3 taxable years also reported a salary, which petitioner received from the company in each year, of somewhat in excess of $15,000 for his general services to the company. Petitioners returned this salary as ordinary income. As to this salary there is no controversy. It is respondent's contention, however, that the percentage payments which petitioner received should also be returned in the same way because they were essentially compensation payments which petitioner received for his services and were not payments received as part of the selling price of an invention. Section 117, which provides for capital gains treatment of profits from the sale of capital assets, is a familiar statute and it is not believed that it is necessary to print it here.

In *Vincent A. Marco*, 25 T. C. 544, 547–548, we stated the general rule, which governs in the decision of such an issue as we have here, as follows:

> It is now well established by the weight of authority that the grant of the exclusive right to manufacture, use, and sell a patented article constitutes a sale of the patent rights with the proceeds taxable as long-term capital gain, provided (1) the invention constitutes a capital asset in the hands of the grantor, and (2) it was held by the grantor for the required period. Proceeds from such a grant constitute long-term capital gain income whether payment is made in a lump sum or over a period of years based on the use of the invention by the grantee. This was what we held in *Edward C. Myers*, 6 T. C. 258. That case has been frequently cited and followed by us. In our decision in that case, we based it largely on the Supreme Court's decision in *Waterman* v. *Mackenzie*, 138 U. S. 252. This latter case was not a tax case but did deal with the question as to when a patent agreement amounted to a mere license and when it amounted to a sale.

In *Kimble Glass Co.*, 9 T. C. 183, we emphasized that the agreement, in order for it to be an assignment rather than a mere license, must provide for the assignment for all three of the rights of the inventor, to wit, "to make, use and vend." In the instant case, did the agreement provide for the assignment of all three of these rights? We do not have the text of the agreement before us. It was lost in a fire which occurred in the factory of the company in 1936. However, it was stipulated that the minutes of a meeting of the board of directors of the company of May 21, 1938, described the agreement as follows:

> Said agreement was entered into under date of May 20th, 1924 and stipulated a five (5%) Per cent Royalty payment to F. S. Speicher, of all sales of Steel Stamps each year (profits permitting) but not to accrue if any year has shown no profit. In return, F. S. Speicher agrees to assign ownership of the special machine for the manufacture of Steel Stamps and Dies and also agrees to assign any future improvements to said machine or patents that he may develop while he was part owner or employee of the M. E. Cunningham Company without necessarily being paid any further royalty payments.

It will be noted from the above agreement that it does not provide in specific language that the assignee, the M. E. Cunningham Company, shall have the exclusive right to make, use, and vend the invention. However, the agreement does specify that petitioner is to assign *ownership* of the machine and any future improvements of the machine that may be developed by him in his research. The petitioner testified at the hearing that he did not retain any right of ownership in the invention. The following questions and answers occur in his testimony at the trial and in the former trial of *M. E. Cunningham Co.*, Docket Nos. 11783 and 27720, the record of which has been made a part of this proceeding:

Q. Did you at the time you turned over this machine, did you retain any right of ownership in connection with the machine?
A. No.
Q. Can you give us the substance of that agreement?
A. Oh, yes; I can pretty nearly the exact words. It was just an agreement that any machine or things that I developed in my work belonged to the Company, anything that I developed would belong to the Company along with this machine that is the steel stamp work.
Q. In other words, your understanding was that when you turned this machine in, it belonged to the Company?
A. Yes.
Q. And your understanding under that agreement of 1924 was that each of those machines or any of them—and it meant the 1939 improvements and this new thing in 1941, all belonged to the Company?
A. All belonged to the Company, that is right.

Although the transfer agreement in this case evidently did not use the words "to manufacture, use and vend," yet it did clearly transfer petitioner's ownership of his invention and that is just as effective as if the customary language "to manufacture, use and vend" is used. See *Halsey W. Taylor*, 16 T. C. 376; *Arthur C. Ruge*, 26 T. C. 138.

We sustain petitioner's contention that there was an assignment of his invention and that the percentage payments received by him in the taxable years were payments to him by the corporation as part of the purchase price of his invention. The Commissioner argues that this cannot be so because petitioner's invention was not patented by him at the time of the purported assignment. In *Edward C. Myers*, 6 T. C. 258, 265, we said:

Petitioner's invention was not patented at the time of sale. In fact application for a patent had not at that time been filed. The application for patent was filed by petitioner January 25, 1932, and the patent was granted December 31, 1935. But petitioner's invention and improvement of the rubber-covered flexible steel track was completely conceived prior to January 1, 1930. Petitioner has proved, clearly enough we think, the completed conception of his invention prior to January 1, 1930, by drawings made, signed, and dated by him, which drawings set forth the invention in sufficient detail to enable those skilled in the art to manufacture the invention and improvement without further application of the inventive act. * * *

In the instant case we think the evidence shows that petitioner had a completed conception of his invention and had actually expressed it in the form of drawings and a machine manufactured under his direction prior to the agreement of May 20, 1924. Respondent's argument that petitioner did not assign the ownership of his invention because it had not been patented is not sustained.

Respondent further argues that even though it be assumed that petitioner made a completed transfer of his invention, nevertheless the percentage amounts which he received in the taxable year would not be entitled to capital gains treatment under section 117 because that section provides that the words "capital assets" do not include "(A) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." It is respondent's contention that petitioner was a professional inventor and that as such the particular invention involved here was one which he held "primarily for sale to customers in the ordinary course of his trade or business." We think the evidence is contrary to what respondent contends. We think our language in *Edward C. Myers, supra,* is appropriate here, wherein we said (6 T. C., at 266) :

Petitioner, during this time, conceived an invention and thereby acquired a property right thereto. He might have made an effort to manufacture and sell the invention and improvement himself. In fact he testified that at one time he considered doing so but decided that his financial resources were not adequate. Instead, he chose to convert his property right by transferring it to Goodrich in exchange for a contract providing payment of determinable annual sums. By thus transferring his one and only invention to Goodrich, petitioner was not transferring property held primarily for sale to customers in any trade or business conducted by him. * * *

We so hold in the instant case. Respondent's contention in this respect, we think, is without merit.

Respondent also contends that, even assuming that petitioner's invention was a capital asset under section 117, nevertheless, petitioner had not held the property for more than 6 months prior to the time of sale. In *Edward C. Myers, supra,* we held that the holding period begins when the invention is completely conceived and drawings made sufficient to make its manufacture possible, and not when a patent is issued. On the facts therein we held that the taxpayer had held his invention for more than 24 months, which was the holding period required under the statute then in force.

In the instant case we think the facts show that petitioner had been working in his spare time for 15 years to discover a method of making multiple copies of steel stamps, and early in 1923 he "fell on and figured out the exact movement," as he expressed it in his testimony at the trial. He proceeded to make drawings and models during 1923 and on May 20, 1924, he entered into the agreement for the sale of his

invention. On these facts, we hold that petitioner has proved that he held his invention for more than 6 months prior to its sale under the agreement of May 20, 1924, the holding period required under section 117.

We sustain petitioner on the capital gains issue and reverse the Commissioner in his determination that the percentage payments were ordinary income under section 22 of the Code. See *F. H. Philbrick*, 27 T. C. 346 (1956).

*Issue 2.*

In his determination of the deficiency for the year 1951, the Commissioner has made additions to the tax of $683.10 under section 294 (d) (1) (A) and $455.40 under section 294 (d) (2). The petitioner disputes the correctness of these additions.

The facts show that petitioners deposited a check with the collector's office and that the amount of this check was ultimately applied against petitioners' 1951 income tax liability. However, this check, upon receipt thereof, could not be identified by the collector's office since it was not accompanied by a declaration for 1951. In such circumstances, it was the policy of the collector's office to communicate with the taxpayer so that unidentified remittances, such as the instant check, could be identified and credited to the proper account. A communication was sent to petitioners on October 5, 1951, and a "dummy" declaration of tax for 1951 was prepared by the collector on December 13, 1951. Both of these dates were subsequent to March 15, 1951, so that a declaration for 1951 could not possibly have been timely filed under the provisions of section 58 (d) (1). In section 294 (d) (1) (A), it is explicitly stated that the declaration must be filed "within the time prescribed." A declaration for 1951 was not filed within the time prescribed and, therefore, the petitioner is liable for the additions to tax under section 294 (d) (1) (A). The failure to file gives rise also to the addition to the tax under the provisions of section 294 (d) (2).

We sustain respondent as to Issue 2. However, respondent, in computing the additions to the tax, has done so on the basis of taxing the percentage payments received by petitioner in 1951 as ordinary income, instead of capital gain as petitioners had reported them on their returns. We have reversed the Commissioner as to Issue 1. The additions to tax should, therefore, be recomputed under Rule 50 in the light of our decision on Issue 1.

*Decision will be entered under Rule 50.*