William W. Taylor and Gene W. Taylor v. Commissioner.
Taylor v. Commissioner
Docket No. 2781-69.
United States Tax Court
T.C. Memo 1970-325; 1970 Tax Ct. Memo LEXIS 33; 29 T.C.M. (CCH) 1488; T.C.M. (RIA) 70325; November 24, 1970. Filed K.G. Seitz, 4321 Hamilton Ave., Cincinnati, Ohio, for the petitioners. Rudolf L. Jansen, for the respondent. RAUM
Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies of $34.78 and $1,845.14 in petitioners' income tax for the calendar years 1965 and 1966, respectively. The only issue remaining for decision is whether amounts received by petitioner, William W. Taylor, in connection with the transfer of certain patent rights should be taxed as capital gain or ordinary income. Findings of Fact
*34 The parties have stipulated certain facts which, together with the attached exhibits, are incorporated herein by this reference. Petitioners, William W. and Gene W. Taylor, are husband and wife. They filed joint Federal income tax returns for the calendar years 1965 and 1966 with the district director of internal revenue at Cincinnati, Ohio, and resided in Cincinnati at the time the petition in this case was filed. During the years 1960 through 1966, William W. Taylor (hereinafter referred to as "petitioner") was engaged in the operation of a sole proprietorship known as The Silent Knight Company, located in Cincinnati. Petitioner owned a United States patent for a manhole cover which he had invented. The patent was to expire on August 29, 1978. He had also applied for Canadian and United Kingdom patents in respect of the same invention. The invention was advertised as "Silent Knight - The Modern Manhole Cover. The first and only truly progressive development in manhole covers in years." A notable feature of the device was its square shape. The frame, which was to be installed at the mouth of the manhole and upon which the manhole lid was to rest, was square, and the lid was *35 formed by two triangular halves, which were joined by iron rods to form a square. The sides of the lid were longer than the diameter of the manhole (to ensure that the lid could not fall through the manhole). As suggested by its name, Silent Knight was advertised as "silent and safe," as well as economical. An advertising leaflet proclaimed: "Silent Knight products are made by foundries, North, South, East and West and sell at freely competitive prices." The Clare and Angel Agreements By a "license agreement," dated October 28, 1959, between petitioner, doing business as the Silent Knight Company (identified therein as "Licensor") and Clare Brothers Ltd. of Preston, Ontario, Canada (identified therein as "Licensee"), petitioner transferred certain interests in his "inventions." [1] After reciting that the inventions were disclosed in an application for Canadian Letters Patent and that petitioner owned "the entire right, title and interest in and to" them, the agreement provided for the grant of a "non-assignable, indivisible license": (a) for the exclusive manufacture solely within the Province of Ontario, (b) for the use and sale without restriction as to territory, [of] *36 manhole covers, shims and frames embodying the inventions, or any of them, as disclosed in the aforesaid Canadian patent application. Unless sooner terminated under the provisions of this agreement, or otherwise, the above license shall extend for the life of any and all patents issued from said application. (2) Licensor hereby covenants and agrees with Licensee that during the existence of this agreement Licensor will 1489 not grant a license to any other licensee giving such licensee the right to manufacture within the Province of Ontario, manhole covers, shims, or frames embodying the inventions, or any of them, disclosed in the aforesaid Canadian patent application, or the right to use the trade mark "Silent Knight" on any goods manufactured within the Province of Ontario. (3) Licensor further covenants and agrees with Licensee that during the existence of this agreement Licensor will not make any agreement with a distributor regarding the distribution of manhole covers, shims and frames within the Province of Ontario without first obtaining the express written permission of Licensee. *37 Petitioner agreed to furnish Clare Brothers all blueprints and other information prepared by it for the manufacture of the inventions and to make available to it for a "reasonable length of time" certain master patterns and master gages for use in production. In addition to a stated consideration of $1.00 Clare Brothers agreed to pay the petitioner five per cent of the net selling price of manhole covers, shims and frames manufactured and sold by Licensee under this agreement. * * * (7) Royalties shall be due and payable from Licensee quarterly on or before the fifteenth day of January, April, July and October for covers, frames and shims sold during the three month period terminating on the last day of the month preceding the month in which the royalty payment is due. All royalty payments should be accompanied by a statement enumerating in detail the manhole covers, shims and frames manufactured and sold and the destination thereof during the period for which the payment is made. At the request of the Licensor, such reports shall be made under oath. * * * (13) In the event that Licensee defaults in any of the payments due under this agreement, Licensor shall have the right to *38 declare the agreement terminated in its entirety upon sixty (60) days written notice to Licensee specifying the defaults and sent by registered mail to the Licensee at its address in Preston. Provided, however, that during said sixty (60) day period Licensee shall have the right to reinstate and maintain the agreement by fully remedying the default upon which said notice is based. The agreement also provided for a minimum annual "royalty" of $250, effective in 1961. In addition, Clare Brothers acknowledged the validity of any patent issued as the result of petitioner's application and agreed that it would not, directly or indirectly, dispute or attack the validity of such patent. The agreement also recited that petitioner was the owner of an application for registration of the trademark "Silent Knight" in Canada, and Clare Brothers agreed to acknowledge petitioner's ownership of the trademark and the registration therefor, when granted. The following provision was made with regard to assignments: (14) This agreement shall enure to the benefit of and shall be binding upon the successors and assigns of Licensor but shall not be assignable by Licensee except to a successor of its *39 entire business in manhole covers, shims and frames. In the event of receivership, insolvency, forced assignment, or bankruptcy of Licensee or in the event of the filing of a voluntary petition therefore, by Licensee this agreement shall automatically terminate forthwith. Petitioner entered into a second "license agreement," dated August 17, 1960, with Angel Manufacturing and Supply Company, Ltd. ("Angel") of North Sydney, Nova Scotia, Canada. It was similar to the 1959 agreement with Clare Brothers but differed from that instrument in the following respects. The "license" granted to Angel was, at least in part, geographically restricted to Canada's Maritime Provinces and was termed "non-exclusive": (1) Licensor hereby grants to Licensee a non-exclusive, non-assignable, indivisible license to manufacture solely within the Maritime Provinces, use and sell, for use in Canada, manhole covers, shims and frames embodying the inventions, or any of them, as disclosed in the aforesaid Canadian patent application. * * * Unlike Clare Brothers, Angel was given the option to cancel the agreement on three months' notice at any time after three years from the date of the agreement. Finally, *40 the Angel agreement did not include a counterpart to the covenant made in the Clare agreement whereby petitioner promised that during the existence of the agreement he would not grant the right to use the trademark "Silent Knight" on goods manufactured within the assigned territory. In all other respects, however, the two instruments were substantially identical. The record does not disclose whether or not, prior to the dates of the Clare and Angel agreements, petitioner had entered into arrangements with other 1490 manufacturers and distributors granting them manufacturing and distributing rights in either Ontario or the Maritime Provinces. The Broads Agreements On October 22, 1960, petitioner doing business as the Silent Knight Company and Broads Manufacturing Company Ltd. of London ("Broads") entered into an agreement transferring certain rights in petitioner's manhole cover. The instrument (entitled "Deed") recited that petitioner (identified therein and in subsequent supplemental "deeds" as "the owner") owned a United States patent, that he had lodged a provisional application for a grant of letters patent for the United Kingdom, and that he had agreed to grant to Broads *41 (identified therein and in supplemental "deeds" as "the licensee") "an exclusive license to manufacture, sell and distribute the said manhole cover in the United Kingdom * * *." The instrument provided in part as follows: 1. IN consideration of the sum of Two thousand dollars now paid by the licensee to the owner (the receipt whereof the owner hereby acknowledges) and of the covenants and agreements by the licensee hereinafter contained the owner hereby grants unto the licensee: (a) A full sole and exclusive license and authority to manufacture, sell and distribute the same manhole cover in the United Kingdom for the period of one year from the date hereof. * * * 2. IF at any time during the period of one year referred to in clause 1 hereof the licensee shall by notice in writing to the owner so request this agreement and the exclusive license granted by clause 1 hereof shall be extended and shall continue in force until determined as provided in clauses 4(v) or 4(vi) hereof. Clause 4 provided that if Broads exercised the option to extend the agreement: (i) The licensee shall during the continuance as so extended of this agreement pay to the owner within Twenty one days after *42 each of the usual quarter days in every year a royalty of Five per cent of the net amount received by the licensee in respect of all sales of the said manhole cover. (ii) The licensee shall keep true and particular accounts of all matters connected with the manufacture sale and distribution of the said manhole covers under this agreement and will on the first day of February in each year deliver to the owner particulars in writing of the number of the said manhole covers manufactured sold and distributed by the licensee during the preceding year and of all sums received therefor. (iii) The licensee shall permit the owner or its accountants at all reasonable times to inspect and take copies of or extracts from any books accounts receipts papers and documents in the possession or under the control of the licensee and relating in whole or in part to the manufacture' sale or distribution of the said manhole covers and to inspect and take an account of all the said manhole covers for the time being in stock or in hand. Once extended beyond the initial one-year period, the agreement could be terminated in the following manner: (v) If any royalties payable hereunder shall be in arrear *43 and unpaid for a period of twenty one days after the same shall have become payable or if the licensee shall commit or allow to be committed a breach of any of the other covenants or agreements herein contained and on its part to be performed or observed and shall not remedy such breach within twenty one days after notice is given to it by the owner requiring such remedy or if the licensee shall go into liquidation or become liable to be wound up or to have its business closed down for any reason other than voluntary liquidation for the purpose of reconstruction or if a receiver shall be appointed on behalf of any holders of debentures of the licensee the owner shall be at liberty in every such case by notice in writing to determine this licence and thereupon the licence hereby granted and all rights of the licensee hereunder shall forthwith cease and determine but without prejudice to the remedy of the owner to sue for and recover any royalties then due and to the remedy of the owner in respect of any previous breach of any of the covenants or agreements herein contained. (vi) Either party hereto may at any time determine this licence by giving to the other party Six months notice *44 in writing of its intention so to do and at the expiration of such notice this licence and all the covenants and agreements herein contained shall forthwith cease and determine but without prejudice to any rights of action then accrued thereunder and on the termination of the licence hereby granted whether by effluxion of time or notice or by the act or default of the licensee or by any other means or happening or event whatsoever the licensee shall not have any claim of any kind whatsoever against the owner in respect of this present licence or the covenants 1491 or agreements contained herein nor for compensation in respect of the termination of the licence or the loss thereof. In addition, petitioner covenanted to give Broads all the information and assistance at its disposal to facilitate manufacture and sale of the manhole cover and promised that, during the continuation of the agreement, he would not manufacture, sell, or distribute the manhole cover within the United Kingdom or grant a license to do so without the written consent of Broads. Broads made the following covenants: 3. IT is hereby agreed and declared as follows: - * * * (ii) The licensee will use its best *45 endeavors to manufacture sell and distribute the said manhole cover to best advantage and on a commercial scale and will meet the demand therefor to an adequate extent and on reasonable terms and will not otherwise do or omit anything which may be or become an abuse of the monopoly rights of the provisional application or any subsequent letters patent relating thereto. (iii) The licensee shall at all times comply with the reasonable requirements of the owner with regard to the manufacture of the said manhole cover and with regard to the standard of workmanship and the finish of the finished articles and shall permit the owner and its agents or servants to have full access at all reasonable times to all places of manufacture of the said manhole cover and to all places where the finished articles may be stored or displayed for the purpose of inspecting the same. (iv) The licensee shall not assign this licence nor grant any sub-licence without the previous consent in writing of the owner and then only upon such terms and conditions as shall be specified by the owner and the licensee shall within 7 days after any such assignment or the grant of any such sub-licence furnish the owner *46 with an attested copy of the executed counterpart of the documents effecting such assignment or of such sub-licence. * * * (vi) The licensee shall not export or knowingly sell for exportation any of the said manhole covers nor any articles which shall infringe any patents or provisional application held by the owner. (vii) The licensee shall not raise or cause to be raised any question concerning or any objection to the validity of the said provisional application or subsequent letters patent relating thereto on any ground whatsoever and will at the request and cost of the owner institute or join with the owner in any proceedings for the protection of the pending application or letters patent relating thereto in the United Kingdom or for the extension of the term of the said pending application or letters patent relating thereto or for the protection by letters patent of any improvement of the said manhole cover and if the said pending application or subsequent letters patent relating thereto shall be or become invalid or be infringed or otherwise defeated in any way whatsoever then the licensee shall not be entitled to any compensation damages or other redress against the owner. *47 On March 8, 1962, petitioner and Broads executed a supplemental "deed." That instrument recited that unforseen delays had prevented an initial survey of the project from being completed within one year of the date of the original agreement and that Broads should have exercised the option to extend the license beyond one year. Under the terms of the supplemental "deed," petitioner granted Broads an "exclusive license and authority to manufacture sell and distribute the manhole cover" from October 22, 1961 (the date on which the one-year term of the original agreement expired) until June 30, 1962, with an option to extend the license: [If] at any time before the said Thirtieth day of June One thousand nine hundred and sixty two the licensee shall by notice in writing to the owner so request the agreement and exclusive licence granted by the original Deed and extended by these presents shall be extended and shall continue in force until determined as provided in clauses 4 (V) or 4 (VI) of the original Deed. On October 17, 1962, petitioner and Broads entered into a third "deed," varying the terms of the original instrument (identified therein as "the Original Deed") as modified *48 by the supplemental "deed" (identified therein as "the Second Deed"). It provided in part as follows: 1. THAT the Owner hereby releases absolutely the right to determine the Original Deed (as subsequently varied by the Second Deed) and the exclusive licence granted thereby by giving to the Licensee six months notice in writing of its intention so to do in consideration of the Licensee paying to the Owner a minimum royalty in every year of ONE THOUSAND POUNDS in advance during the continuation of the Original Deed (as subsequently varied by the Second Deed) and the exclusive licence granted thereby the first of such payments to be made 1492 on the Thirtieth day of June One thousand nine hundred and sixty two. 2. THAT Clause 4 (ii) of the Original Deed shall be varied so that the particulars in writing of the number of the manhole covers manufactured sold and distributed by the Licensee during the preceding year to the Thirtieth day of June in that year and of all sums received therefor shall be delivered to the Owner on the Thirtieth day of September next following in that year. * * * 4. PROVIDED ALWAYS that if the Original Deed (as subsequently varied by the Second Deed) *49 and the exclusive licence granted thereby shall be determined by the Licensee giving to the owner six months notice in writing of its intention so to do (as provided for in the Original Deed) which shall expire before the end of the year in respect of which the said sum of One thousand pounds shall have been paid in the manner aforesaid then the Owner shall repay to the Licensee a proportionate part of the said sum of One thousand pounds in respect of the period from the date of the expiry of the notice to the expiry of the year in respect of which the said payment of One thousand pounds shall have been made. 5. SAVE as aforesaid the parties hereto confirm all the term and conditions contained in the Original Deed as subsequently varied by the Second Deed. Petitioner subsequently obtained patents for his invention from the United Kingdom and Canada. They were to expire, respectively, on June 20, 1977, and July 18, 1978. Between 1962 and the end of 1966, petitioner received annual payments from Broads pursuant to their agreements. Such payments were at times in excess of the minimum amounts called for by the agreements. During this period Broads undertook the construction of a *50 foundry, designed primarily to manufacture the manhole covers governed by its agreements with petitioner. The cost of the foundry was approximately three million pounds. During the years 1965 and 1966, petitioner received the following amounts as a result of the agreements with Clare Brothers, Angel, and Broads: Payor
1965
1966
Clare Brothers, Ltd.
$ 244.71
$ 603.87
Angel Manufacturing & Supply Co., Ltd.
602.16
1,784.55
Broads Manufactur- ing Co., Ltd
3,308.69
10,918.98 During 1965 and 1966, petitioner also received annual payments, generally ranging in size from about $100 to approximately $700, from five other enterprises as the result of agreements similar to those described. On their Federal income tax return for 1965, petitioners reported the payments received in 1965 in connection with the three agreements summarized above as ordinary income. However, within the time prescribed by law, petitionrs filed an amended return for 1965 seeking a refund of income tax allegedly erroneously paid as a result of reporting the payments as ordinary income rather than as long-term capital gain. On their 1966 return, petitioners reported the payments received *51 in that year as long-term capital gain. In his statutory notice of deficiency to petitioners, the Commissioner disallowed certain deductions for real estate and personal property taxes which petitioners had claimed on their 1965 return. He also determined that the payments received in 1966 in connection with the agreements described above were taxable in that year as ordinary income rather than as long-term capital gain. Petitioners have conceded the correctness of the Commissioner's disallowance of the deduction for the claimed real estate and personal property taxes. Opinion RAUM, Judge: The question presented is whether petitioner and his wife are entitled to treat as long-term capital gain the payments received from Clare Brothers, Angel, and Broads in 1965 and 1966 in return for the transfer of certain rights in petitioner's manhole cover. Petitioners' claim for capital gain treatment of the proceeds of the three transactions in issue is based primarily upon section 1235, I.R.C. 1954. Section 1235(a) provides: SEC. 1235. SALD OR EXCHANGE OF PATENTS. *52 (a) General. - A transfer (other than by gift, inheritance, or devise) of property consisting of all substantial rights to a patent, or an undivided interest therein which includes a part of all such rights, by any holder shall be considered the sale or exchange of a capital asset held for more than 6 months, regardless of whether or not payments in consideration of such transfer are - 1493 (1) payable periodically over a period generally coterminous with the transferee's use of the patent, or (2) contingent on the productivity, use, or disposition of the property transferred. The parties appear to agree that even though petitioner had not obtained patents from the United Kingdom and Canada at the time the original agreements were executed, the payments in question were made in return for "rights to a patent." See Franklin S. Speicher, 28 T.C. 938, 944-945, acq. 1958-2 C.B. 7. Nor do the parties dispute that petitioner, the inventor of the manhole cover, qualifies as a "holder," as that term is defined by section 1235(b).[2] What divides the parties is whether petitioner transferred "all substantial rights" to the manhole cover invention. *53 Whether there has been a transfer of "all substantial rights" in respect of the Clare, Angel and Broads transactions depends in each situation upon an appraisal of all the evidence relating to that situation. Cf. Joe L. Schmitt, Jr., 30 T.C. 322, 331, affirmed 271 F. 2d 301 (C.A. 9). And the evidence must be evaluated in the light of petitioner's burden of proof to establish that there has been a transfer of "all substantial rights." Upon a review of the record before us, we have concluded (1) that petitioner has failed to prove that there was such a transfer in the case of the Clare and Angel agreements and (2) that he has established the existence of such a transfer in respect of the Broads agreements. 1. The Clare and Angel Agreements. We note at the outset that the agreements were drafted as "licenses," that the parties were identified therein as "licensor" and "licensee," and that the periodic payments were termed "royalties." Although the use of this terminology indicates a license arrangement rather than a completed assignment or sale, such language, while of some weight, is not controlling. We must look to the substance of what the parties *54 have put together. Oak Manufacturing Co. v. United States, 301 F. 2d 259, 261-262 (C.A. 7); Merck & Co. v. Smith, 261 F. 2d 162, 164 (C.A. 3); Schmitt v. Commissioner, 271 F. 2d 301, 305 (C.A. 9), affirming 30 T.C. 322; Watson v. United States, 222 F. 2d 689, 691 (C.A. 10); William S. Rouverol, 42 T.C. 186, 193, nonacq. 1965-2 C.B. 7; cf. Waterman v. MacKenzie, 138 U.S. 252, 256. "[The] entire transaction, regardless of formalities, should be examined in its factual context to determine whether or not substantially all rights of the owner in the patent property have been released to the transferee, rather than recognizing less relevant verbal touchstones." S. Rept. No. 1622, 83d Cong., 2d Sess. p. 440 (1954); cf. Rose Marie Reid, 26 T.C. 622, 632, acq. 1956-2 C.B. 8. The Commissioner has pointed to a number of features of the Clare and Angel agreements which, in his judgment, disqualify the payments made pursuant to them from capital gain treatment. *55 He has emphasized that the rights conferred by the agreements were both non-assignable and geographically limited and that neither agreement specified the grantee's right to sue in its own name for patent infringement. There is substantial doubt whether these factors alone would suffice to deny petitioners capital gain treatment. Compare Waterman v. MacKenzie, 138 U.S. 252, 256-261; Regs. section 1.1235-2(b)(1)(i); Oak Manufacturing Co. v. United States, 301 F. 2d 259, 262 (C.A. 7); Schmitt v. Commissioner, 271 F. 2d 301, 307 (C.A. 9), affirming 30 T.C. 322, 332-334, with Allen v. Werner, 190 F. 2d 840, 842 (C.A. 5); Vincent B. Rodgers, 51 T.C. 927, 928-932; Merck & Co., v. Smith, 261 F. 2d 162, 165 (C.A. 3); William S. Rouverol, 42 T.C. 186, 193-194, nonacq. 1965-2 C.B. 7. These factors are nevertheless part of the total picture which may not be ignored. And other aspects of that total picture support the Commissioner's determination. It has generally been considered *56 necessary to transfer the exclusive right to manufacture, sell, and use patented property in order 1494 for a grant of an interest in the patent to qualify as a sale - at least where such rights are considered "substantial." See, e.g., Waterman v. MacKenzie, 138 U.S. 252; Schmitt v. Commissioner, 271 F. 2d 301, 304-307 (C.A. 9), affirming 30 T.C. 322; Vincent B. Rodgers, 51 T.C. 927, 928-930; Roy J. Champayne, 26 T.C. 634, 646-647, acq. 1958-2 C.B. 4. We think that under both the Clare and Angel agreements, petitioner failed to transfer the exclusive right to manufacture, sell, and use his manhole covers. Under the Clare agreement petitioner granted a "non-assignable, indivisible license" in respect of his invention (a) for the exclusive manufacture solely within the Province of Ontario, (b) for the use and sale without restriction as to territory * * * Plainly, only the right to manufacture was explicitly described as "exclusive." In sharp contrast, the right to use and sell was not thus fixed. We think the difference is crucial, and may not be brushed aside merely because, in a following *57 paragraph, petitioner covenanted that he would not make any agreement with a "distributor" regarding the distribution of manhole covers, etc., within Ontario without first obtaining Clare's permission. It is by no means clear what the work "distributor" means in this context - i.e., whether it encompasses any seller (such as a retailer or a wholesaler), or whether it is limited to a more narrow class of dealer in manufactured goods or commodities. And in view of the fact that the word "exclusive" was employed only in respect of manufacture, the inference is strong that the provisions in the later paragraph were intended to refer only to certain types of sellers. Moreover, there still remains a tenable construction of these provisions to the effect that petitioner had not given up his own right personally to sell or use within Ontario. The matter in any event is entirely too murky for us to conclude that petitioner had parted completely with the right to use and sell in Ontario, and since the burden was on him we cannot find that he had transferred "all substantial rights." The Government's position in respect of the Angel agreement is even stronger. The grant of rights to manufacture, *58 use, and sell was expressly termed "non-exclusive." As in the Clare agreement, petitioner promised only to refrain from licensing other manufacturers and "distributors" while the agreement remained in effect. The result follows a fortiori from the conclusion that we reached as to the Clare agreement. In their brief, petitioners suggest that law other than that codified in section 1235 may authorize capital gain treatment of the payments in issue. Petitioners cited no authority, statutory or otherwise, for this proposition, and did not argue the point. In any event, in Myron C. Poole, 46 T.C. 392, 404, we rejected such a contention: We also find unsound Poole's alternate contention that if section 1235 does not apply to the 1956 transfers, he is entitled under other provisions of law to capital gains treatment for the royalties paid in connection with such transfers. The legislative history with respect to section 1235 explains that a holder's recourse to prior case law is proper only when the transaction is not one described in section 1235(a). In other words, if the payments for a patent are contingent upon productivity, use, or disposition, or if they are payable *59 periodically over a period generally coterminous with the transferee's use of the patent, section 1235 is the holder's exclusive provision for qualifying for capital gains treatment. [7] * * * We think that our decision in Poole disposes of petitioners' suggestion here. Cf. Thomson v. United States, 25 AFTR 2d 70-697, 703-706 (E.D.N.Y.); Leonard Coplan, 28 T.C. 1189, 1192, *60 acq. 1958-2 C.B. 4; Herbert C. Johnson, 30 T.C. 675, 682, acq. 1958-2 C.B. 6. 2. The Broads Agreements. We think that, by virtue of his three agreements with Broads, petitioner did transfer all substantial rights to the manhole cover, and that payments received pursuant to those 1495 agreements during 1965 and 1966 qualify for capital gain treatment. The Commissioner points to a number of aspects of the agreements which, in his judgment, require a contrary conclusion. We consider them seriatim. The Commissioner notes that the original "deed" was granted for only a one-year term, and asserts that neither of the two supplemental deeds varied the one-year provision. It has been held that a grant of rights to a patent which terminates before the expiration of the remaining life of the patent does not amount to a "sale" of patent rights. See Oak Manufacturing Co., v. United States, 301 F. 2d 259, 263 (C.A. 7); Jacques R. Milberg, 52 T.C. 315, 317, Regs. section 1.1235-2(b)(1)(ii). Here the first instrument gave to Broads an exclusive license to manufacture, sell and distribute for one year, plus an option to *61 extend the agreement until terminated in accordance with clauses 4(v) or 4(vi). The first supplemental agreement reaffirmed the terms of the original agreement and extended the term of the license for eight additional months, until June 30, 1962. The second supplemental agreement, dated October 17, 1962, did not expressly state that the option had been exercised. However, the agreement related only to clause 4 of the original agreement, which applied only if the option had been exercised. Furthermore, Broads continued to make annual payments to petitioner between 1962 and 1966, which were required only if the agreement had been extended pursuant to the option given to Broads. We conclude that as of October 17, 1962, the parties understood that the option had been exercised and that the agreement had been extended beyound the initial period. After that time the agreement could be terminated only in accordance with clauses 4(v) and 4(vi) of the agreement, as modified. These clauses permitted termination only if Broads' royalty payments were in arrears, if Broads violated its covenants under the agreement, or if Broads elected to terminate the agreement and gave six months' written notice *62 of its intention to do so. The resulting possibility in these circumstances that the agreement might terminate prior to the expiration of the life of the patent is not sufficiently significant to deny treatment of the transaction as a sale. See Merck & Co. v. Smith, 261 F. 2d 162, 164-165 (C.A. 3); Allen v. Werner, 190 F. 2d 840, 842 (C.A. 5); Watson v. United States, 222 F. 2d 689, 691 (C.A. 10); William S. Rouverol, supra, 42 T.C. 186, 194; Roy J. Champayne, supra, 26 T.C. 634, 638, 640; Lamar v. Granger, 99 F. Supp. 17, 38 (W.D. Pa.). The Commissioner also contends that Broads was not given the right to use the patented invention and that petitioner's retention of such right precludes treatment of the transaction as a sale. In this respect, the Commissioner relies upon Regs. section 1.1235-2(b)(3)(ii) which provides that retention of the right to use a patent "may or may not" constitute a substantial right. Although the agreements did not include the word "use", they did grant Broads a license to "manufacture sell and distribute" the manhole cover. We think that the agreements, together with the *63 surrounding circumstances, reveal that a complete assignment of all substantial rights was intended and consummated. See Rose Marie Reid, supra, 26 T.C. 622, 633; Franklin S. Speicher, supra, 28 T.C. 938, 943-944. Moreover, even were the right to "use" the manhole cover not granted by implication, we are quite doubtful that retention of the right to "use" the manhole cover (other than by manufacturing or selling it) is a meaningful or substantial right. Cf. Werner v. Allen, 42 AFTR 1166, 1172 (M.D. Ga.), affirmed 190 F. 2d 840 (C.A. 5). The Commissioner points out that petitioner also retained the right to manufacture, sell, and distribute the manhole cover in the United Kingdom and the right to license others to do so, subject to the consent of Broads. However, since both of the foregoing rights were contingent upon the consent of Broads, they obviously do not constitute substantial rights in the patented property. The Commissioner also contends that since the agreements prevented Broads from assigning its license or sublicensing under it without petitioner's consent, petitioner's power to prohibit such assignments constituted *64 retention of a substantial right. Although there is some support for the Commissioner's position, [3] we think that in the circumstances of this case, petitioner's power to prohibit further assignments did 1496 not amount to retention of a substantial right in the patented property; it did not interfere with Broads' manufacture and distribution of the property and enabled petitioner only to veto proposed assignments, not to make assignments himself. See Vincent B. Rodgers, 51 T.C. 927, 931-932 Allen v. Werner, 190 F. :
2d 840, 842 (C.A. 5); Parke, Davis & Co. 31 B.T.A. 427, 430, acq. XIV-1 C.B. 15; Watson v. United States, 222 F. 2d 689, 691 (C.A. 10). The Commissioner asserts that under the agreements, petitioner *65 controlled the prosecution of patent infringement suits and that this amounted to retention of a substantial right in the patented property. We disagree. It is not at all clear that petitioner retained the power to control all of such suits. The original agreement stated only that where the owner so requested, Broads would "institute or join with the owner in any proceedings" relating to the patent. In any event, provisions determining the party to bring infringement suits are generally considered "procedural" in nature and not significant enough to deny treatment as a sale. See William S. Rouverol, supra, 42 T.C. 186, 193-194; Merck & Co. v. Smith, 261 F. 2d 162, 165 (C.A. 3). Compare Oak Manufacturing Co. v. United States, 301 F. 2d 259, 262 (C.A. 7); Schmitt v. Commissioner, 271 F. 2d 301, 307 (C.A. 9), affirming 30 T.C. 322. Finally, the Commissioner emphasizes that Broads was denied the right to export the manhole cover. The agreements granted manufacturing and distribution rights within the United Kingdom only. However, in Vincent B. Rodgers, 51 T.C. 927, we held a more restrictive geographical *66 limitation to be insufficient to defeat treatment as a sale. There the transferee's rights were limited to an area within the borders of the nation issuing the patent. Here, where the manufacturing and distributing rights granted to Broads were coextensive with the territory of the United Kingdom, the nation issuing the patent, our reasoning in Rodgers applies a fortiori. Even when considered together, the factors stressed by the Commissioner do not warrant treatment of the Broads transaction as a licensing arrangement rather than as a sale or assignment. Such rights as petitioner retained are simply not sufficiently significant interests to amount to one or more "substantial rights" in the patented property as that term has been interpreted in the decided cases. Decision will be entered under Rule 50. Footnotes
1. The agreements here in issue refer to petitioner's "inventions", rather than "invention", presumably because it was thought that the manhole cover included a number of distinct inventions, including the lid, the frame, and shims.↩
2. SEC. 1235. SALE OR EXCHANGE OF PATENTS. * * * (b) "Holder" Defined. - For purposes of this section, the term "holder" means - (1) any individual whose efforts created such property, or (2) any other individual who has acquired his interest in such property in exchange for consideration in money or money's worth paid to such creator prior to actual reduction to practice of the invention covered by the patent, if such individual is neither - (A) the employer of such creator, nor (B) related to such creator (within the meaning of subsection (d)).↩
7. "It is the intention of your committee that, if the mode of payment is as described in subsection (a), the sale of a patent by any 'holder' must qualify under the section in order for such 'holder' to obtain capital gain treatment." (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 441 (1954).) We are aware that sec. 1.1235-1(b), Income Tax Regs., provides that if sec. 1235 does not apply because a transfer is made to a related person, the tax consequences of the transfer are to be determined under other provisions of law. If that section of the regulations is intended to imply that when a holder transfers a patent and receives payments in the manner described in sec. 1235(a)↩, such payments may qualify for capital gains treatment, the regulations must yield to the contrary legislative purpose.
3. See Oak Mfg. Co. v. United States, 301 F. 2d 259, 262 (C.A. 7), and Schmitt v. Commissioner, 271 F. 2d 301, 307 (C.A. 9), affirming 30 T.C. 322, where limitations on the transferee's ability to make assignments were among a number of restrictions taken into account in holding the transfers in issue not to be sales. Compare Vincent B. Rodgers, 51 T.C. 927, 931-932↩.