RAY E. OMHOLT AND JEANETTE OMHOLT, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2702–70, 2703–70.    Filed July 9, 1973.

---

[1] The case of Powerlock Systems, Inc., docket No. 2703–70, is consolidated herewith.

*David E. Wasserstrom* and *Tom P. Monteverde*, for the petitioners.
*Mary Ann Hagan*, for the respondent.

QUEALY, *Judge:* The respondent determined deficiencies in income tax to be due from the petitioners as follows:

RAY E. OMHOLT AND JEANETTE OMHOLT

| Docket No. | Year | Deficiency |
|---|---|---|
| 2702-70 | 1963 | $4, 374. 63 |
| | 1964 | 12, 484. 02 |
| | 1965 | 24, 860. 79 |

POWERLOCK SYSTEMS, INC.

| Docket No. | Year | Deficiency |
|---|---|---|
| 2703-70 | 1962 | $9, 792. 08 |
| | 1963 | 14, 784. 82 |
| | 1964 | 17, 257. 02 |
| | 1965 | 20, 765. 36 |

Those issues presented for our decision are as follows: [2]

(1) The amount allowable as a deduction under section 167(a)[3] on account of amounts accrued by Powerlock Systems, Inc., as royalties owing to Ray E. Omholt on account of the transfer of a patent covering the design and installation of hardwood floors.

(2) To the extent that such royalties exceeded the amount deductible under section 167(a), the amount of such excess taxable to Ray E. Omholt, individually, as a dividend.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Ray E. Omholt and Jeanette Omholt[4] are husband and wife whose legal residence at the time of the filing of the petition herein was in Berwyn, Pa. Joint Federal income tax returns were duly filed by Ray E. Omholt and Jeanette Omholt on the cash basis method of accounting for the calendar years 1963, 1964, and 1965, with the district director of internal revenue, Philadelphia, Pa.

Powerlock Systems, Inc. (hereinafter sometimes referred to as Powerlock), is a corporation organized under the laws of New Jersey with its principal office at Mid-Atlantic Park, 590 Grove Road, Thorofare, N.J. Pursuant to a reorganization agreement dated August 25, 1971, effective September 1, 1971, Powerlock acquired all of the assets and assumed all of the liabilities of Powerlock Floors, Inc., a Penn-

---

[2] The petitioners have not alleged any error with respect to certain adjustments made by the respondent in the statutory notice. Accordingly, the petitioners will be deemed to have conceded the propriety of those adjustments.

[3] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[4] Jeanette Omholt is a petitioner herein solely by reason of having filed joint income tax returns with her husband. Hereinafter references to "petitioner" or "Omholt" are to Ray E. Omholt.

sylvania corporation, which was the original corporate petitioner herein. At the time of the filing of its petition, Powerlock Floors, Inc., maintained its principal office at 2026 Chancellor Street, Philadelphia, Pa. Powerlock Floors, Inc., duly filed corporate Federal income tax returns on an accrual method of accounting for the calendar years 1962, 1963, 1964, and 1965, with the district director of internal revenue, Philadelphia, Pa.

At all times here pertinent, Ray E. Omholt owned 79 percent of the stock of Powerlock and served as its president. Bert Omholt, petitioner's father, owned the remaining 21 percent until December 29, 1967, when 10 percent was transferred in trust for the children of Ray E. Omholt. No other transfers of Powerlock stock have ever been made..

Powerlock Floors, Inc., was the successor to Kiplock Fastening Devices, a corporation incorporated on December 23, 1959. That corporation, as was each of its successors, was engaged in the design and sale of floors and flooring systems. Neither the stock ownership nor business activities of the corporation have been affected by the respective changes in corporate name except as outlined above.

Petitioner applied to the U.S. Patent Office for letters patent on a system for installing and securing hardwood floors on February 23, 1961. On May 1, 1962, U.S. Letters Patent No. 3,031,725 was issued to Ray E. Omholt with reference to said system.

Said patent issued to Omholt covered a floor system to be used principally in schools and gymnasiums. The advantages of the system were that the floor had better stability under conditions of moisture and humidity which prevented buckling and a more uniform balance upon impact, especially advantageous in use as a basketball court. In addition, as stated in the patent:

the principal object of the present invention [is] to provide an improved wood floor system which is adequately held and retained in position after application, in which the cost thereof is considerably less than systems presently available, and which has a greater wearing service than systems heretofore available.

Under a verbal agreement, Powerlock agreed to purchase all of Omholt's right, title, and interest in the invention for which the patent application of February 23, 1961, had been filed. That oral agreement, effective as of January 1, 1962, was formalized in written memorandum form on May 29, 1963. That memorandum provided, in pertinent part:

1. OMHOLT did represent and absolutely warrant that he then was the sole and absolute owner of the entire right, title and interest in and to the Invention; that he then had the sole and unencumbered inchoate right of absolute ownership as to the entire right, title, and interest in and to any and all patents ultimately issued on said Invention; that there were no existing or inchoate licenses, liens, or shoprights of any kind, name or nature whatsoever outstanding against

the Invention or any such patents; and that he then had the full legal right, power and authority to enter into this agreement with respect to the Invention and any such patents.

\* \* \* \* \* \* \*

4. (a) POWERLOCK did agree that, from and after January 1, 1962, and for so long as the Patent or any other United States patent or any reissue thereof claiming the Invention remains unexpired and has not been adjudged either invalid or unenforceable in its entirety by a decision of a competent court from which no appeal is or can be taken, it will pay to OMHOLT an amount equal to thirty percent (30%) of the "Net Sales Proceeds" earned and actually received by it from any and all its sales of products embodying the Invention which are manufactured, sold, used, or any of them, in the United States, its territories and possessions, and also an amount equal to sixty-five percent (65%) of any and all sums earned and actually received by it in the nature of royalties from any licencee of POWERLOCK under the Patent or any other United States patent or any reissue thereof claiming the Invention.

(b) As then defined, "Net Sales Proceeds" means POWERLOCK's invoice prices, net of return allowances, proper discounts, and any sales, use or similar excise taxes or levies imposed upon any buyer, user, lessee or licensee and which POWERLOCK may be required to collect. It was agreed that no deduction shall be made of any tax upon POWERLOCK, including specifically taxes upon or measured by net or gross income or receipts; nor shall any deduction be made of any selling expenses or general administrative expenses.

For the years 1962 and 1963, Powerlock accrued on its books amounts equal to 30 percent of the net sales proceeds it received from sales of products embodying the patent. By verbal agreement, that percentage was reduced in 1964 to 16 percent of the net sales proceeds received by Powerlock. In 1965, also by verbal agreement, the percentage was further reduced to 8 percent of the net sales proceeds.

The amounts accrued by Powerlock with regard to its obligation to Omholt for the patent, computed as aforementioned, were as follows:

| Year | Percentage of net sales | Amounts accrued |
|---|---|---|
| 1962 | 30 | $32, 763. 92 |
| 1963 | 30 | 55, 768. 27 |
| 1964 | 16 | 86, 932. 15 |
| 1965 | 8 | 80, 576. 51 |

Said amounts due to petitioner from Powerlock could not be determined until sometime after the end of the calendar year because the corporation did not have the total sales figures, upon which such amounts were based, until subsequent to December 31 of each respective year.

On March 15, 1963, 1964, and 1965, Powerlock issued its negotiable notes bearing interest at 5 percent to Omholt in the amounts of $32,763.92, $55,768.27, and $86,932.15, respectively, for the royalties accrued in respect of the patent.

Powerlock's balance sheets, attached to its income tax returns, reflect the following as of the end of each of the years in question:

| | 1962 | 1963 | 1964 | 1965 |
|---|---|---|---|---|
| *Assets* [1] | | | | |
| Cash | $6,781 | $2,569 | $2,625 | $41,803 |
| Notes and accounts receivable | 40,831 | 48,714 | 127,143 | 240,053 |
| Inventories | 2,009 | 3,838 | 5,679 | 61,383 |
| Buildings and other fixed depreciable assets | 12,802 | 24,171 | 28,523 | 23,407 |
| Other assets (prepaid expenses) | 336 | 1,589 | 1,662 | 687 |
| Total assets | 62,759 | 80,881 | 165,632 | 367,333 |
| *Liabilities and capital* | | | | |
| Accounts payable | 17,691 | 19,339 | 55,381 | 51,446 |
| Mortgages, notes, and bonds payable in less than 1 year [2] | 32,764 | 53,250 | 112,843 | 75,000 |
| Other current liabilities (payroll) | 5,000 | 7,500 | | 6,066 |
| Mortgages, notes, and bonds payable in 1 year or more [2] | | | | 185,166 |
| Accrued expenses | | 1,684 | | |
| Other liabilities (taxes) | | 1,969 | 4,189 | 14,602 |
| Capital stock (common) | 10,000 | 10,000 | 10,000 | 10,000 |
| Earned surplus and undivided profits | (2,696) | (512,861) | (16,781) | 25,053 |
| Total liabilities and capital | 62,759 | 80,881 | 165,632 | 367,333 |

[1] The value of the patent purchased from Omholt was not reflected as an asset in the balance sheets.
[2] Includes notes payable to Ray E. Omholt.

In 1965, Powerlock obtained loans from the Central-Penn National Bank of Philadelphia. In order to obtain said loans, Powerlock and Omholt, on April 20, 1965, executed an agreement with the bank subordinating Powerlock's obligations to petitioner to the liabilities of Powerlock to Central-Penn National Bank.

During the years in question Omholt received from the corporation in payment on the aforementioned notes, the following amounts:

| Year | Amounts received |
|---|---|
| 1963 | $37,363 |
| 1964 | 49,548 |
| 1965 | 26,300 |

Those amounts were reported by Omholt on his income tax returns for the respective years as long-term capital gains from the sale of the Powerlock patent.

The relationship of the accrued royalties to Powerlock's net sales and reported profit or loss for the years in question is reflected by the following table:

| Year | Net sales | Net profit before royalties | Royalties | Reported profit (loss) |
|---|---|---|---|---|
| 1962 | $109,213 | $30,389 | $32,764 | ($2,375) |
| 1963 | 185,894 | 46,213 | 55,768 | (9,555) |
| 1964 | 538,643 | 81,410 | 86,932 | (5,522) |
| 1965 | 1,014,391 | 129,411 | 80,577 | 48,835 |

In the early stages of its development, the patented flooring system was promoted, sold, and installed through an exclusive arrangement

between Powerlock and the Robbins Flooring Co. (hereinafter referred to as Robbins), a firm prominent in the hardwood flooring industry with a wide dealership network. Under said arrangement, Robbins was to mill and supply to its dealers all of the maple used on any particular installation and Powerlock was to sell them the remaining components. Omholt's royalty was initially computed on 30 percent of the net sales proceeds from the components sold by Powerlock, which, according to petitioner's testimony, was intended to produce a royalty of "approximately 6 percent" of the sales price of the installed product.

In July 1963, following a progressive deterioration of their relationship,[5] Robbins notified Powerlock that "we have come to the conclusion that it would be best for both of us if Robbins disassociates itself as exclusive supplier of Powerlock-milled flooring." As a result of said disassociation, Powerlock was required to find another source of maple flooring for use in its system and to expand its promotional activities, each of which were formerly furnished by Robbins. In 1964, after securing other sources of maple, Powerlock began selling the maple flooring as well as the components used in its systems, thereby increasing substantially the potential "net sales proceeds" from sales of products embodying Omholt's invention.

A charge equal to 6 percent of the combined sales of both hardware and maple flooring to be installed pursuant to the Powerlock patent constituted a reasonable royalty for purposes of the deduction permitted under section 167(a). For the taxable years 1962 to 1965, inclusive, the amount of said sales and the royalties allocable thereto are as follows:

| Year | Sales | Royalty |
| --- | --- | --- |
| 1962 | $212, 528 | $12, 751 |
| 1963 | 361, 749 | 21, 704 |
| 1964 | 538, 643 | 32, 321 |
| 1965 | 1, 014, 391 | 60, 432 |

For the taxable years 1963 to 1965, inclusive, the petitioner received a distribution from Powerlock with respect to its stock within the meaning of section 301 to the extent that amounts paid to petitioner by Powerlock exceeded the amount which constituted a reasonable royalty within the meaning of section 167(a).

OPINION

The principal issue here to be decided is whether the royalties paid to Ray E. Omholt by his controlled corporation were reasonable in amount. There is no dispute that a valuable patent was actually conveyed by petitioner to Powerlock and the parties are in agreement

---

[5] See *Powerlock Floors, Inc.* v. *Robbins Flooring Co.*, 280 F. Supp. 627 (D. Del. 1968), affd. 404 F. 2d 875 (C.A. 3, 1968).

that reasonable royalties may be deducted as depreciation by the payor [6] and reported as capital gain by the recipient thereof.[7] There, however, their agreement ends.

The respondent has determined that 6 percent of Powerlock's net sales proceeds from the sale of goods relating to Omholt's invention represents a reasonable royalty, and has made adjustments accordingly. In arriving at this determination, respondent does not distinguish between those years in which Powerlock supplied only hardware and those years in which Powerlock supplied both the hardware and the maple. The petitioners contend that the royalties actually paid were intended to produce a royalty to Omholt of 6 percent of the total installed sales price of the flooring system, and that such amounts were reasonable.

At the outset, we are thus faced with the burden of determining a reasonable royalty on account of the patent in question without the benefit of an agreement fixing a royalty as between a purchaser and a seller dealing at arm's length. The petitioner was the controlling stockholder of Powerlock. Any and all agreements with respect to the amount of the royalty were determined by him in the dual capacity of purchaser and seller. Initially, there was no record of such agreement. It was subsequently reduced to writing on May 29, 1963, and provided for a royalty equal to 30 percent of sales by Powerlock of the hardware subject to the patent. This percentage was thereafter reduced from time to time without formal action. On this basis, we are not prepared to place any reliance on the May 29, 1963, agreement for there is nothing contained therein which would serve to determine the reasonableness of a royalty.

On the other hand, for the later years the respondent concedes that a charge equal to 6 percent of the combined sales of both the hardware and the maple would constitute a reasonable royalty for the patented flooring system.

Since Powerlock started out supplying only hardware, the royalty allowed by the respondent, predicated upon the application of a 6-percent rate to the sales of hardware alone, would clearly be inadequate.

---

[6] Rev. Rul. 67–136, 1967–1 C.B. 59, provides in pertinent part:

"[where] the purchase price of the patents * * * is contractually fixed as a *reasonable percentage* of the annual earnings from such patents * * * over the period of their remaining lives, the taxpayer-purchaser may deduct a sum equal to the *payments* made during the taxable year on the purchase price of such patents * * * as an allowance for depreciation under section 167 of the Code. See *Associated Patentees, Inc.* v. *Commissioner,* 4 T.C. 979 (1945) * * * [Emphasis supplied.]"

[7] Consistent with his position as stated in Rev. Rul. 69–482, 1969–2 C.B. 164, respondent has made no argument herein that capital gain treatment is prohibited by sec. 1235, I.R.C. 1954. Accordingly, the decision in this case is not made upon that basis. See *Myron C. Poole,* 46 T.C. 392, 404 (1966) ; *Thomson* v. *U.S.* (E.D.N.Y. 1969, 25 A.F.T.R. 2d 70–697, 70–1 U.S.T.C. par. 9193) ; *William W. Taylor,* T.C. Memo. 1970–325, 29 T.C.M. 1488, 1494, 39 P–H Memo. T.C. par. 70,325 ; *Lan Jen Chu,* 58 T.C. 598, 608 (1972).

In our opinion, the record thus fully supports a royalty of 6 percent on combined sales of hardware and maple. With respect to anything in excess of that amount, the petitioner has failed in his proof.

The petitioner presented no testimony of any expert familiar with either his patent or hardwood flooring systems in general with respect to the value of the patent or what might be a reasonable royalty between two parties dealing at arm's length. Further, his own testimony on the valuation of the patent may be discounted, *Grand Rapids Store Equipment Corp.* v. *Commissioner*, 59 F. 2d 914 (C.A. 6, 1932), affirming sub nom. *Grand Rapids Show Case Co.*, 12 B.T.A. 1024 (1928), and the percentages or royalties paid in other cases to which we are directed are irrelevant.

Accordingly, upon a consideration of the record as a whole it is our opinion that the amount allowable as a reasonable royalty on account of the use of the Powerlock patent is the equivalent of 6 percent of combined sales of the hardware and the maple, regardless of whether Powerlock in fact supplied the maple. In his determination with respect to the years 1964 and 1965, the respondent concedes this much. Any amount in excess of 6 percent of such sales was properly disallowed by the respondent as being excessive.

On or before March 15 of each year, Powerlock would determine the amount to be accrued as a royalty due to Omholt for the preceding year. On March 15, 1963, 1964, and 1965, Powerlock issued to Omholt its negotiable notes bearing interest at 5 percent in the amounts of $32,763.92, $55,768.27, and $86,932.15, respectively, for the amounts accrued in respect of the patent for Powerlock's taxable years ending December 31, 1962, 1963, and 1964. In payment of the amounts due on those notes, Omholt received and reported on his income tax returns for the years 1963, 1964, and 1965, the amounts of $37,362.67, $49,548.25, and $26,300.06, respectively.

To the extent that the face amount of the notes issued by Powerlock exceeded the amounts allowable as a royalty, the respondent has determined that there resulted a distribution of earnings and profits taxable as a dividend within the meaning of section 301, relying on *Alvin B. Lowe*, 44 T.C. 363 (1965), and *Allan S. Vinnell*, 52 T.C. 934 (1969). Therefore, he argues, the notes must be included, however characterized, in the year of receipt.

Irrespective of the amounts accrued by Powerlock, petitioner contends that there should be included in his income only the cash payments received by him in the amounts of $37,363, $49,548, and $26,300, respectively, for the taxable years 1963, 1964, and 1965. Petitioner contends that the notes had no value and that, even assuming that they were not valueless, they were not intended as payment when issued, but only as evidence of Powerlock's obligation for the royalty pay-

ments. Petitioner thus argues that any excess taxable as a dividend should be determined by reference to the payments actually made by Powerlock, as distinguished from the face amount of the notes issued by Powerlock.

The problem with the respondent's position is that it is clear from the record before the Court that Powerlock was not in a position to pay the amounts accrued as owing to the petitioner on demand, or the notes when issued, and stay in business. The notes added nothing to the obligation. Since both the debt and the notes were payable on demand it cannot be said that the notes were more than the evidence of the debt. *Virginia W. Stettinius Dudley*, 32 T.C. 564 (1959), affirmed per curiam 279 F. 2d 219 (C.A. 2, 1960) ; *Jay A. Williams*, 28 T.C. 1000 (1957).

If we had before us a debtor having the resources with which to pay the obligation, unquestionably the amounts accrued would be deemed to have been constructively received by the petitioner whether regarded as a royalty or a dividend. Sec. 1.451–2(a), Income Tax Regs. However, a taxpayer cannot be deemed to have constructively received an amount which the debtor was unable to pay. *Hyland* v. *Commissioner*, 175 F. 2d 422 (C.A. 2, 1949) ; see also *Fetzer Refrigerator Co.* v. *United States*, 437 F. 2d 577 (C.A. 6, 1971). The only manner in which Powerlock could have obtained the additional funds was through borrowing. As the record shows, in order to do so, it was necessary to subordinate the obligations due to Omholt.

Accordingly, the dividend deemed to have been received by the petitioner within the meaning of section 301 must be limited to the excess of the amount received on account of the indebtedness due from Powerlock over the allowable royalties computed on the basis of 6 percent of total sales of the flooring systems covered by the Omholt patent.

*Decisions will be entered under Rule 50.*